IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELIZABETH BARBER, et al., *on behalf of themselves and all others similarly situated*,<br><br>*Plaintiffs*,<br><br>vs.<br><br>ELISABETH DEVOS, *in her official capacity as United States Secretary of Education*, and UNITED STATES DEPARTMENT OF EDUCATION,<br><br>*Defendants.* | Case No. 20-cv-1137 |

I, Mark A. Brown, hereby declare under the penalty of perjury as follows:

1. I am over the age of 18 and competent to testify to the matters herein.

2. I am Chief Operating Officer of Federal Student Aid ("FSA") in the U.S. Department of Education (the "Department"). I was appointed to my position on March 4, 2019, by U.S. Secretary of Education Betsy DeVos ("Secretary"). I served in the U.S. Air Force ("USAF") for 32 years and retired as a major general. Most recently I served as the deputy commander for the Air Education and Training Command. Prior to that I served in a series of roles in the USAF.

3. I certify that I am duly authorized, am qualified, and have been given authority by the Department to make the statements contained in this Declaration in support of the Department's Opposition to Plaintiffs' Amended Motion for Class Certification. The statements contained herein are based on my personal knowledge as an employee of the Department, information I have received in my official capacity from other Department employees and Department

1

contractors, including Maximus Federal Servicers ("Maximus"), and my review of the pertinent records.

4.  As Chief Operating Officer, I oversee the management of FSA. Through my duties as Chief Operating Officer and my discussions with Department staff and Maximus's staff, I am familiar with the Department's efforts to carry out the mandates of Congress in the CARES Act, including the steps taken by the Department and Maximus to cease wage garnishments until September 30, 2020, pursuant to Section 3513(e)(1) of the CARES Act.

5.  FSA is a performance-based organization in the Department that was established by Congress in title I, part D of the Higher Education Act of 1965, as amended ("HEA"), to manage the administrative and oversight functions supporting the Federal student financial aid programs authorized under title IV of the HEA. Those programs include the William D. Ford Federal Direct Loan program, the Federal Pell Grant Program and the Federal Work-Study Program.

6.  Under the Direct Loan Program, the Department makes loans to undergraduate and graduate students and their parents to pay the costs of attending institutions of higher education. The Department makes and disburses the loans and collects the loans once the borrower enters repayment. The Department contracts with private companies to service and collect on the loans. If a borrower defaults on a loan (generally by not making a payment for 270 days), the Department can collect on the loan through administrative wage garnishment, Federal tax offset or litigation. As of the end of March 2020, there were more than 35 million borrowers with Direct Loans with a total outstanding balance of more than $1.28 trillion.

**Administrative Wage Garnishment ("AWG") Process**

7.  Administrative Wage Garnishment ("AWG") under 488A of the Higher Education Act of 1965 (20 U.S.C. § 1095a) or section 3720D of title 31 of the United States Code is a process in

which the Department or another government agency collecting delinquent non-tax debt may garnish the wages of a delinquent debtor without first obtaining a court order. Under AWG, an employer withholds an amount of an employee's wages and pays those amounts to FSA in satisfaction of a wage garnishment order issued by FSA.

8. Upon default on federal student loans, which is defined as having gone at least 270 days without making payment, borrowers are sent a notice that advises them that their debt is now due in full and provides them with an opportunity to enter into a voluntary payment arrangement. If a borrower does not enter into a satisfactory repayment arrangement within 65 days of that notice being sent, their account is placed with a collection agency.

9. Before AWG may be undertaken, FSA must comply with certain procedural steps.

10. Prior to initiating garnishment, the FSA must provide student loan debtors with 30 days written notice, mailed to the debtor's last known address, of its intent to collect by wage garnishment and an explanation of the debtor's rights.

11. These rights include the right to inspect and copy records, to enter into a repayment agreement to avoid garnishment, to contest the existence or amount of the debt to be collected as well as the terms of the repayment schedule, and to receive an administrative hearing before a hearing official on any objections to the garnishment filed in a timely manner.

12. Absent any objections or a request for a hearing, or if upheld after a hearing before a hearing official, FSA will issue an AWG order requiring garnishment of an amount not to exceed 15 percent of the borrower's disposable pay.

13. FSA then instructs its default loan servicer, Maximus, to notify the employer to begin garnishment by providing the employer with the AWG order.

14. An employer must honor a garnishment order issued under Section 3720D and is liable to FSA for amounts that are not withheld pursuant to a garnishment order, together with attorney fees, costs, and, in the court's discretion, punitive damages. 31 U.S.C. § 3720D(f)(1)(B).

15. Employers generally process the wage garnishment orders using their normal payroll processes, so it can often take up to four weeks or even longer from the time the garnishment order is transmitted to the employer to start garnishment.

16. The process of applying the garnishment order to the employee's wages is wholly dependent on the employer implementing the notice of cancellation.

17. FSA's Debt Management and Collection System ("DMCS") generates a "Notice of cancellation of order for withholding of wages" automatically once an account is paid in full or if garnishment should stop for other reasons. FSA then directs Maximus to send this notice to the employer. As with the original wage garnishment order, employers generally process the cease garnishment instruction using their normal payroll processes, so it too can often take up to four weeks or even longer from the time the stop garnishment order is transmitted to the employer until wages are no longer garnished.

18. The employer must take the final steps to implement the cancellation of wage garnishment by changing its internal procedures to no longer withhold funds from the borrower's wages.

19. If an employer fails to cancel the wage garnishment and continues to garnish a borrower's wages, the Department will issue a refund to the borrower of any additional payments received.

**AWG Refund Process**

20.     Maximus initiates the refund process by first creating a refund request. FSA reviews the request and either approves it or returns it for follow-up. If the request is approved, Maximus posts the refund financial transaction to the borrower's account and sends the refund request to FSA's Finance Accounting Operations Division. FSA's Finance Accounting Operations Division forwards the funding request to the Department of the Treasury, which issues a refund check directly to the borrower.

21.      FSA monitors refund activity on a daily basis to ensure borrowers are receiving refunds in a timely manner. (e.g., garnishments received, refunds initiated, refunds approved, refunds sent to Treasury).

22.     FSA's ability to respond effectively to the national emergency, including halting wage garnishments, began long before the CARES Act was implemented. For example, in January, FSA began a pilot designed to enhance servicer oversight and improve the customer experience for students and borrowers. We placed a team of FSA liaisons within three of our largest loan servicers, including Maximus. In addition, for some time now FSA has been building an enhanced quality assurance environment and internal control function within FSA. This team conducts independent assessments and validations of servicer compliance and performance through both planned and unplanned reviews. These efforts were in place prior to the COVID-19 emergency, establishing a foundation that has enabled FSA to successfully implement the CARES Act, including the provisions relating to wage garnishments.

**FSA's Response to the National Emergency and CARES Act**

23.     Even prior to the passage of the CARES Act, on March 25, 2020, Secretary DeVos ordered the Department to halt collection activity and wage garnishments and refund any funds recovered through garnishments received after March 13, 2020.

24.     On March 26, 2020, FSA instructed Maximus to take steps to stop collection activity on all defaulted student loans.  FSA ordered Maximus to stop all wage garnishments and initiate refunds of garnishments received on or after March 13, 2020.

25.     In order meet the needs of the unprecedented nature of this national emergency and to comply with this directive, Maximus reengineered its processes and systems to facilitate the timely issuance of cancellation orders to approximately 115,000 employers.  In compliance with FSA's directions, Maximus began making the necessary system and process changes that would allow it to automate the processes by which it notifies employers to stop wage garnishments and refund payments to affected borrowers.

26.     Maximus, while completing necessary system changes, initiated an outbound calling campaign to those employers with the largest number of borrowers under wage garnishment orders to instruct them to cease all wage garnishments the FSA had ordered.

27.     On April 18, 2020, approximately three weeks after the commencement of the necessary system changes, Maximus began sending automated notifications via the U.S. Postal Service to employers instructing them to stop active wage garnishments.  Maximus sent the letters to the most recently updated address for the employer.

28.     By April 23, 2020, less than 30 days after the CARES Act was signed, Maximus reported that it had notified, either by mail or telephone call, 98% of employers that had been actively garnishing wages, instructing them to stop garnishments for Department-held debt.

29. In late April, Maximus began initiating calls to employers who continued to send in wage garnishments, and Maximus continues to make those calls daily.

30. Because some employers had not immediately complied with the original stop garnishment notice, between May 9 and 11, Maximus sent a second round of stop garnishment notices to approximately 37,000 non-compliant employers who were still garnishing wages from April 28 – May 7.

31. Also, between May 9 and 11, 2020, Maximus sent letters to borrowers who continued to have their wages garnished advising them that the Department had sent a stop garnishment order to their employer. This letter included a copy of a stop garnishment notice that borrowers could take to their employer to expedite the stop in garnishment.

32. On May 11, 2020, I personally performed an onsite visit to Maximus' fulfillment vendor to physically observe and confirm that FSA's instructions regarding employer and borrower notifications were being properly executed.

33. On May 15, 2020, Maximus sent a third round of stop garnishment notices to all employers that remained non-compliant. This stop garnishment notification was sent via certified mail whereby the United States Postal Service confirms delivery.

34. While Maximus had contacted 98% of all employers by April 23, as part of FSA's ongoing validation and verification efforts, we identified several employers that, due to discrepancies in Maximus' records, still needed to be contacted (e.g., employers who had invalid addresses in the system or borrowers who were associated with the wrong employers).

35. On May 16, 2020, Maximus sent stop garnishment notices to the remaining 2% of employers who had not previously received one.

36. As of May 16, 2020, Maximus reported that it had notified, either by mail or telephone call, 100% of employers that had been actively garnishing wages as of May 11, 2020, instructing them to stop garnishments for Department-held debt.

37. FSA and Maximus continue to monitor AWG payments received on a daily basis to ensure all garnishments are stopped and refunds are issued.

**Number of affected borrowers by garnishment**

38. Between the beginning of the national emergency period described in the CARES Act (March 13, 2020) and the date of the filing of this declaration, approximately 115,000 employers had garnished the wages of approximately 390,000 borrowers.

39. For the week ending May 7, 2020, the number of borrowers still subject to garnishment had dropped by 86%.

40. FSA cannot directly determine when an employer has canceled garnishment for its employees with federally-held student loans. Instead, FSA on a weekly basis measures the percentage of borrowers for whom it has received an AWG payment from an employer compared against the total number of unique borrowers for which FSA has received an AWG payment since March 13, 2020. The percentage of borrowers reported as subject to garnishment varies slightly from week to week because different borrowers are paid and subject to AWG each week depending on the pay schedule of their employers (e.g., some borrowers get paid weekly, bi-weekly, monthly). To clarify the Department's statement in its May 14, 2020, status report, therefore, for the week ending May 14, 2020, employers garnished fewer than 3 percent of the borrowers in the original pool covered by the CARES Act. The best information available to the Department indicates that for the week ending on May 28, employers garnished approximately 4 percent of the borrowers in the original pool covered by the CARES Act. Typically, the

Department receives a higher amount of AWG payments in the middle of each month. For May, that middle of the month period would be reflected in the statistics for the week ending May 28 and resulted in the slight increase in the percentage of subject borrowers from 3 to 4 percent.

**FSA's efforts toward refunding garnishment**

41. FSA has also engaged in efforts to ensure that refunds of payments claimed through AWG since March 13, 2020, have been made as quickly as possible.

42. As part of the stop garnishment notices sent to employers, FSA requested that employers encourage borrowers to contact the Department to provide an updated address to which garnishment refund payments could be sent.

43. Given the unprecedented volume of involuntary payments that required refunds during this period, Maximus also implemented an automated process that allowed FSA to expedite refunds for borrowers.

44. This process, which was implemented on April 14, 2020, allowed FSA to work through the volume of refund payments dating back to March 13, 2020. This automated process reduced the processing time for any new reimbursements from several weeks to generally 4-5 business days from the date the garnishment is received at the Treasury Lockbox until the refund check can be mailed to the borrower by the Department of the Treasury.

45. As of June 1, 2020, the Department has issued AWG refunds totaling over $172 million to over 370,000 borrowers, representing over 94% of the wages garnished since March 13. Refunds for the remaining borrowers have been initiated by FSA and are either being actively processed or on hold because the borrowers owed a refund have an invalid address on file,

46. For those borrowers with invalid addresses FSA and Maximus deployed an address validation tool on the Debt Resolution Portal (an online tool for defaulted borrowers) on April 9,

2020.  Defaulted borrowers are provided information on how to access and use the Debt Resolution Portal when they enter default and use it regularly to confirm their address and provide additional information to FSA.  So far over 30,000 borrowers have used the tool to validate their address.  FSA continues work to validate addresses for the approximately 21,000 borrowers with invalid addresses on file.

**FSA's work regarding the named plaintiffs**

47.    On May 6, Plaintiff Barber's employer confirmed to Maximus that it has ceased garnishing her wages as of April 24, 2020.  FSA has confirmed that the Department of the Treasury issued a refund check to Ms. Barber for each of the garnishment payments deducted from her paycheck since March 13, 2020. According to FSA's files, Ms. Barber has cashed all of those refund checks.

48.    On May 21st, Plaintiff Jenkins' employer, confirmed to FSA that it has ceased garnishing her wages. FSA has confirmed that the Department of Treasury has issued refunds for each of the garnishments since March 13, 2020.  According to FSA's files, Ms. Jenkins has cashed 4 of the 5 checks issued.

49.    The Department has and will continue to work closely with Maximus to ensure that employers follow its directives to cease garnishment and make appropriate refunds.

I declare under penalty of perjury, pursuant to the provisions of 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this day of June 2, 2020.

*Mark A. Brown*
_____
Mark A. Brown
Chief Operating Officer
Office of Federal Student Aid
United States Department of Education